[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff has filed for a dissolution of her marriage with the defendant. This matter has been vigorously contested by the parties. The court heard testimony over the course of eight days of trial. Based upon the evidence presented, the court makes the following findings. CT Page 2491
The plaintiff and the defendant married on February 14, 1982 in Norwich, Connecticut. It is the plaintiff's first marriage and the defendant's second marriage. The plaintiff has continuously resided in the state of Connecticut for at least twelve months prior to the bringing of this action. The marriage has broken down irretrievably. The parties have two minor children, Lesleigh, age 13, and Blair, age 11, born as a result of the marriage.
The plaintiff is forty-eight years old. She has a few health problems, including vitamin B-12 deficiency, bursitis in her right hip and arthritis in her left knee. None of her health problems prevent her from working full time.
The plaintiff is a high school graduate and she has completed one year of a community college. She is licensed as a licensed practical nurse (LPN). She has a substantial work history as an LPN. The plaintiff has been employed as a per diem nurse at a hospital and as a substitute school nurse. She last worked as a nurse in 1993. She is currently unemployed.
The plaintiff has the training and experience necessary to resume employment as a licensed practical nurse. There is also no reason why the plaintiff cannot obtain employment on a full time basis. Ronald Freedman, a vocational rehabilitation counselor, testified on behalf of the defendant that the average statewide salary for an LPN is $13 per hour. Based upon his testimony, the court finds that the plaintiff has an earning capacity of $27,000 per year.
The defendant is forty-nine years old. He is a college graduate, with a bachelor of science in business administration. He is in good health.
The defendant is the president and sole owner of the Gilman Corporation. The Gilman Corporation is a custom manufacturer of foam products. Its customers include the United States Coast Guard and companies in Texas and Michigan. The company maintains offices and a plant in Gilman, Connecticut.
The Gilman family has been involved in manufacturing since 1897. The Gilman Corporation was formed in 1948. The defendant acquired the majority of his interest upon the death of his mother in 1979. He has been working with the family manufacturing CT Page 2492 business on a full-time basis since the mid 1970's. The Gilman Corporation was the subject of a lockout and a battle for control between the defendant and his uncle. The dispute was eventually resolved in 1991 with the defendant becoming the sole shareholder of the corporation.
The court finds that the defendant's gross weekly income from employment to be $1,450 and his net weekly income to be $984. The defendant also receives income from the rental of the factory building to the Gilman Corporation and residential property to an employee. The defendant has net weekly income from these rental properties and from interest in the amount of $538.
At the time of their marriage in 1982, the parties stood in substantially dissimilar financial positions. The plaintiff brought her personal belongings with her into the marriage. The defendant, in contrast, had accumulated considerable assets prior to the marriage. He had three pieces of real estate, stocks valued at more than $450,000 and other liquid assets worth in excess of $65,000.
Prior to the marriage, the plaintiff was working as a per diem nurse at a health care service. She stopped working in November 1983 immediately prior to the birth of the parties' first child. She resumed employment as a part-time per diem nurse at a hospital in the fall of 1984. The plaintiff again ceased working for a short period of time upon the birth of their second child. She continued to work part-time as a nurse until 1993 when she terminated her employment in order to care for the children full-time.
The parties physically separated on October 28, 1995. Each of the parties points to the other as the cause of the dissolution of the marriage. The plaintiff claims that the defendant was controlling and demeaning throughout the marriage. The defendant asserts that the plaintiff was emotionally cold and unappreciative of his financial contributions to the family. Each party feels victimized by the other and is consumed with anger as a result. The court finds that both parties bear responsibility for the breakdown of the marriage.
Based on the testimony and evidence submitted to the court, money has been the predominant focal point of the parties' lives together and control of financial matters has been a perpetual battleground. The parties maintained separate bank accounts CT Page 2493 during the marriage. The defendant was so domineering that he would require the plaintiff to specifically itemize in writing each and every household expenditure before he would reimburse her. For example, if the plaintiff bought socks for the children or took them to McDonalds, she was required to record it on the monthly expense list.
The plaintiff was so concerned about her financial dependency upon the defendant that she negotiated an agreement prior to terminating her job in 1993 that he would pay her what she would have otherwise earned. He agreed to do so and then subsequently reduced her weekly amount from $400 per week to $225 per week and finally to $200 per week because he felt that more was not necessary to pay her personal and household expenses.
The defendant also felt abused by the plaintiff concerning financial matters. He believed that the plaintiff failed to appreciate his considerable efforts to provide financially for the family. He also complained of her lack of support during the lengthy and acrimonious fight with his uncle over control of the Gilman Corporation.
The battle over financial issues consumed the marriage and continued throughout the dissolution process. It has left each of them angry and bitter.
The parties disagree on the issue of custody. The plaintiff wants sole legal custody of the minor children. While the defendant agrees that physical residence of the children should be with the plaintiff, he has requested joint legal custody. The visitation schedule recommended by the children's attorney has been, for the most part, agreed to by the parties. They disagree only as to when the visitation on Sunday should end and whether the defendant should be able to arrange additional visitation directly with the children. The defendant also objected to the children's attendance at St. Michael's parochial school.
Two separate custody evaluations were conducted. An evaluation was undertaken by Mary Depaola, a family services counselor with the Office of Family Relations, from May 20, 1996 through December 10, 1996. Depaola found that the parties are hostile toward each other and bitterly polarized. Each of them is self absorbed and obsessed with fighting over the financial aspects of the dissolution. Their behavior has seriously and adversely impacted their relationships with their children. CT Page 2494 Depaola recommended that the court award sole legal custody of the minor children to the plaintiff and provide the defendant with extensive visitation.
Robert D. Meier, a licensed psychologist, also conducted a psychological evaluation. His study was performed during the month of October 1996. Meier similarly found that deep rooted conflict characterizes the parties' relationship. He also found each party to be self-involved and focussed primarily on their own needs. If they continue their quarreling ways, Meier recommended that the parties live farther apart so that the children are not constantly exposed to the conflict.
He determined that the plaintiff has been more involved over the years in the children's day to day activities and that she is the resource that the children would be more likely to turn to for emotional support. The defendant is less demanding of the children and more perceptive regarding their behavior. Meier recommended that custody of the children be given to the plaintiff, provided she can learn to overcome her hostility and anger toward the defendant.
A custody decision is one of the most difficult judgments made by any court. It involves fundamental rights and powerful emotions. It determines the future care and well-being of a child. The legal standard governing the determination of custody is clear. The court must award custody based on the best interests of the child. See General Statutes § 46b-56 (b).
The parties' deep and constant conflict was apparent to both evaluators and to this court. Their anger and hostility to one another preoccupies their thoughts and actions. They are unable to communicate, negotiate or agree. Unfortunately, their children are exposed to and often placed in the middle of these disputes.
Given the parties' constant conflict and their inability to set aside their differences when addressing their children's needs, an award of joint custody would not be in the best interests of the minor children. Sole custody with precise and substantial visitation by the noncustodial parent would best meet the children's needs because it would preserve their relationship with each parent while minimizing the discord between them.
The plaintiff has been the children's primary care giver. She is also their principal source of emotional support. It is most CT Page 2495 appropriate that sole custody be awarded to the plaintiff.
With respect to the issue of the children's attendance at St. Michael's school, the court declines to enter an order prohibiting their attendance at said school. The children have been attending St. Michael's since the fall of 1993. The defendant agreed at that time to allow them to attend St. Michael's. The defendant did not state at trial that his children's enrollment at a Catholic school violated his personal religious beliefs. The defendant did not present any evidence to the court that it is not in the children's best interests that they continue their education at the school. The plaintiff as the sole custodian of the children is free to send them to St. Michael's school if she determines that it is in their best interests that she do so.
The dissolution hearing also involved extensive disagreement over the distribution of property. The parties differed on the value of their property and on the assignment of their respective interests.
The parties jointly own the marital home at 9 Center Drive in Stonington. The property was bought in 1988 for $215,000. The plaintiff contributed $43,000 that she received from her mother toward its purchase. The property sits on land that is leased. The lease expires on April 14, 2009. The court finds the fair market value of the home to be $185,600. The property is presently encumbered by a mortgage with an outstanding balance of approximately $44,000.
The defendant owns solely in his name an extensive amount of additional real property. The defendant owns residential property consisting of a single family house at 5 Center Drive in Stonington. This property is adjacent to 9 Center Drive. It similarly sits on land that is leased through April 14, 2009. The current fair market value of the property is $174,000. The property currently has a mortgage with an outstanding balance of approximately $60,000.
The plaintiff currently resides at 9 Center Drive and the defendant lives at 5 Center Drive. Ideally, in order to facilitate contact by the children with both parents, the parties would continue to live near each other. Unfortunately, the closeness of the residences has only fostered continued and deepening conflict between the parties. The children have been CT Page 2496 and continue to be exposed to these conflicts. It is not in their best interests that the parties continue to live in close proximity to each other.
The defendant owns commercial property at 1 Polly Lane in Gilman, Connecticut. A factory building which houses the Gilman Corporation is constructed on the property. The fair market value of the property is presently $1 million. The mortgage on the property has a current outstanding balance of approximately $1,093,000.
The defendant holds title to residential property at 32 Gilman Road and at 34 Gilman Road in Bozrah, Connecticut. The property at 32 Gilman Road is a single family house currently rented to an employee of the Gilman Corporation. The property at 34 Gilman Road is also a single family home and is currently occupied by the defendant's sister. The current fair market value of each property is $42,000 and $40,000 respectively. The property at 32 Gilman Road is encumbered by a mortgage with an outstanding balance of approximately $13,000.
The defendant owns 5.1 acres of vacant, industrial land at Fitchville Road which straddles the towns of Bozrah and Lebanon. The present fair market value of the property is $150,000.
The defendant also owns a small parcel of industrial land at 521 Fitchville Road in Bozrah, Connecticut. The land is unbuildable due to its size and the existence of a city waterline. The land's current fair market value is $2,000.
The defendant owns real property located at Route 289, lot four in Lebanon, Connecticut. The property consists of a building lot of approximately 2.5 acres with a fair market value of $39,000.
The defendant also possesses a one-third interest in the Lawrence M. Gilman Trust. The trust consists of a 94 acre parcel of undeveloped land located at Fitchville Road, Stockhouse Road and Brush Hill Road in Bozrah, Connecticut. The present fair market value of the land is $750,000. Therefore, the current value of the defendant's interest in the trust is $250,000.
The defendant possesses a vested one-third interest in the estate of Lawrence Gilman. The estate consists of real property at 40 Gilman Road, Bozrah, Connecticut with a fair market value CT Page 2497 of $80,000 and cash totaling approximately $6,000. The value of the defendant's interest in the estate is approximately $28,000.
The defendant holds a 100 percent interest in the Gilman Corporation. Each party presented testimony of an expert witness as to the current value of the defendant's interests in the Gilman Corporation. The court finds the testimony of the plaintiff's expert to be more persuasive on this issue.
The plaintiff's expert, Mark Harrison, determined that the present fair market value of the defendant's 100% interest in the Gilman Corporation is $620,000. The plaintiff's expert also found that the defendant had an additional asset in the form of an outstanding loan made by the defendant to the corporation. The loan has a balance due of 332,000 as of December 31, 1996. The loan's principal is being repaid by the corporation at the rate of $3,400 per month plus interest at the rate of 9.75%.
The defendant's expert, Paul Ruby, opined that the total value of the defendant's interest in the corporation, including the value of the note, was $238,000.
The plaintiff's expert was more convincing for a number of reasons. Harrison used corporate figures for the last five years in determining the corporation's profit and loss. Ruby only used a three-year average notwithstanding his admission that five years is typically the standard. Ruby also simply averaged the results of the two valuation methods that he used rather than weight them as is commonly done.
In addition, Ruby treated the defendant's loan to the corporation as a contribution to capital. Such treatment was not appropriate in light of the evidence in this case. The funds were given by the defendant to the corporation as a loan, are being treated by the corporation as a loan and are being paid back with interest on a monthly basis. The funds should have been considered a credit obligation of the corporation.
The plaintiff has IRA's at the Norwich Savings Bank totaling $19,509 as well as an Oppenheimer IRA in her name valued at $3,307 and a Fleet Bank IRA in her name valued at approximately $6,000.
The defendant has an Amex Annuity which totals $41,738, a Fleet Bank IRA in his name valued at approximately $6,000 and a CT Page 2498 Franklin Fund IRA valued at $9,996. He also has bonds from the Sherbourne Corporation valued at $2,000. The defendant also has life insurance policies with a cash value totaling $25,897.
The court also has before it for determination motions for contempt filed by both parties. The plaintiff filed two motions for contempt alleging that the defendant failed to pay family support as ordered by the court. The defendant has filed numerous motions for contempt alleging that the plaintiff failed to provide visitation with the minor children as ordered by the court.
The court was not presented with evidence that the defendant willfully failed to pay the pendente lite support ordered by the court. Therefore, the plaintiff's motion for contempt is denied.
The court finds that the plaintiff refused to allow the defendant to visit with the children on November 9, November 12, November 16, November 19, November 23, November 26, and November 30, 1996 in violation of the court's orders entered on September 6, 1996. The court further finds that the plaintiff's violations of the court's orders were willful.
The plaintiff was previously found in contempt of the court's visitation orders on May 21, 1996. Less than six months later, the plaintiff again violated the court's orders and repeatedly denied the defendant visitation with the children. In light of these actions, the court has serious concerns as to whether the plaintiff fully appreciates the importance of complying with the court's orders and the consequences for not doing so. It is fundamentally important that the children have visitation with their father according to the court's schedule. In order to insure that visitation occurs when scheduled, the court imposes a fine of $150 for every visitation missed, now and in the future, due to the plaintiff's willful actions. The court also finds that an award; to the defendant of attorney fees in the amount of $750 for the prosecution of the motions for contempt is reasonable.
In determining the orders contained herein, I have carefully considered all the relevant statutory criteria, including those contained in General Statutes § 46b-56 as they relate to custody and visitation, § 46b-81 as they relate to the assignment of property, § 46b-82 as they relate to the award of alimony, and § 46b-84 as they relate to the award of child support. The court enters the following orders: CT Page 2499
1. The marriage is ordered dissolved on the grounds of irretrievable breakdown.
2. The plaintiff is awarded sole custody of the minor children.
3. The defendant is awarded the following visitation:
 A. During the regular school year: every Tuesday from 3:30 p.m. until 8:30 p.m. and every other weekend from Saturday noon until Sunday 7:00 p.m.
 B. During the summer: every Tuesday from 3:30 p.m. until 8:30 p.m. and every other weekend from Friday 4:00 p.m. until Sunday 9:00 p.m.
 C. During vacation: the defendant shall have the children for one of their two week long school vacation periods. His visitation shall begin on Friday after school and end the following Friday at 5:00 p.m. whether or not that second weekend is his normally scheduled visitation time. The plaintiff shall have her school vacation with the children from Friday to Friday with the defendant having visitation the second weekend regardless of whether it is his normally scheduled weekend visitation.
 During the summer, each party shall be entitled to two non-consecutive weeks of uninterrupted time with the children.
 During the Christmas week school vacation, the defendant shall have the children for an additional two days with one overnight during the Christmas break from school.
 D. Holidays: The defendant shall be entitled to the following holidays each year: the first night of Passover from 3:30 p.m. until 9:00 p.m.; Rosh Hashanah from 3:30 p.m. until 9:00 p.m.; Yom Kippur from 3:30 p.m. until 9:00 p.m.; and Father's Day from 9:00 a.m. until 7:00 p.m.
 The plaintiff shall be entitled to the following holidays each year: Christmas Eve from 3:30 p.m. until December 26 at 9:00 a.m.; the first night of Hanukkah from 3:30 p.m. until 9:00 p.m.; Easter Sunday from 9:00 a.m. CT Page 2500 until 7:00 p.m.; Mother's Day from 9:00 a.m. until 7:00 p.m.
 The following holidays shall be alternated each year: Thanksgiving weekend from Wednesday at 5:00 p.m. until Sunday at 7:00 p.m.; Memorial Day weekend from Friday at 5:00 p.m. until Sunday at 7:00 p.m.; the Fourth of July from 9:00 a.m. until 7:00 p.m.; and Labor Day weekend from Friday at 5:00 p.m. until Sunday at 7:00 p.m.
 Should one of the defendant's weekends coincide with a federal Monday holiday other than those specifically identified above, his visitation with the children shall continue until Monday at 5:00 p.m. provided he is not working on that Monday holiday.
 All vacation and holiday visitation shall replace and take precedence over the regular visitation schedule.
 E. The children, together or separately, may exercise an option to have additional visitation with the defendant. This option may be exercised by each child a maximum of six times annually. The children may arrange this additional visitation directly with the defendant. The defendant shall notify the plaintiff in writing at least 48 hours prior to the visitation and provide information as to the time and place of the visit. Each visitation may not exceed 10 hours. The plaintiff shall not interfere with the visitation.
 F. In addition to any other sanction that the court may deem appropriate, the plaintiff shall be fined $150 per day for any willful violation of the court's visitation orders.
 G. Both parties shall enjoy reasonable liberal telephone access to the children while the children are not in their care.
 H. Each parent shall promptly notify the other in case of any child's serious illness while in his or her care. "Serious illness" shall mean any illness which confines the child to bed for more than two days or any illness which requires medical intervention. "Promptly" shall be defined as within 48 hours of the initial bed confinement, prior to any medical intervention if non-emergency, and immediately from any emergency room treatment facility. CT Page 2501
4. The parties shall not argue or speak derogatorily about the other in the presence of the children.
5. The defendant shall pay child support to the plaintiff in the amount of $373 per week which is in accordance with the child support guidelines.
6. The plaintiff may claim the oldest child as an exemption on her tax return and the defendant may claim the youngest child as an exemption on his tax return. The parties shall provide each other with any documents necessary to effectuate this provision.
7. The defendant shall continue to provide medical insurance for the minor children. The plaintiff and the defendant shall share equally the cost of any uninsured and unreimbursed health care expenses, including medical, dental, orthodontic, psychiatric and psychological expenses, for the minor children. Each party shall pay his or her share of the uninsured and unreimbursed health care expenses within thirty (30) days of being presented with documentation of said expenses by the other party.
8. The defendant shall maintain life insurance in the amount of $150,000 for the benefit of the minor children, naming the minor children as irrevocable beneficiaries, until the youngest child has reached the age of eighteen. The defendant shall also maintain life insurance in the amount of any unpaid alimony for the benefit of the plaintiff for as long as he has an outstanding obligation to pay alimony to her. The defendant shall not borrow against or otherwise encumber said life insurance policies.
9. The defendant shall pay lump sum alimony to the plaintiff in the total amount of $131,000, with payment to be made as follows: $2,000 to be paid each month on June 1, July 1, August 1, and September 1, 1997; and $1,500 to be paid each month from October 1, 1997 through and including July 1, 2004.[1]
10. The plaintiff is awarded sole ownership of the marital home at 9 Center Drive, Stonington, Connecticut. The defendant shall convey his interest in the property by quitclaim deed within thirty days of the date of this decision. The plaintiff shall be solely responsible for paying the mortgage, taxes, and liens, if any, on the property. The plaintiff shall hold the defendant harmless and indemnify the defendant with respect to any and all mortgages, liens and encumbrances on the property. CT Page 2502 The plaintiff shall obtain, if possible, a refinancing of the current mortgage so that the defendant is no longer a mortgagor.
11. The plaintiff is awarded sole ownership of the residential property at 5 Center Drive, Stonington, Connecticut. The defendant shall convey his interest in the property by quitclaim deed within thirty days of the date of this decision. The plaintiff shall be solely responsible for paying the mortgage, taxes, and liens, if any, on the property. The plaintiff shall hold the defendant harmless and indemnify the defendant with respect to any and all mortgages, liens and encumbrances on the property. The plaintiff shall obtain, if possible, a refinancing of the current mortgage so that the defendant is no longer a mortgagor.
12. The defendant shall retain sole ownership of the following real property free and clear of any interest of the plaintiff:
A. 1 Polly Lane, Gilman, Connecticut
B. 32 Gilman Road, Bozrah, Connecticut
C. 32 Gilman Road, Bozrah, Connecticut
 D. 5.1 acres of vacant, industrial land at Fitchville Road
E. 521 Fitchville Road, Bozrah, Connecticut
 F. real property located at Route 289, lot four in Lebanon, Connecticut
13. The defendant shall retain his entire right, title and interest in the Lawrence Gilman Trust and in the estate of Lawrence Gilman.
14. The defendant shall retain his entire right, title and interest in the Gilman Corporation and the note receivable from said corporation.
15. The parties shall retain ownership of the bank accounts currently in their sole possession.
16. The plaintiff shall retain sole ownership of the IRA's CT Page 2503 currently in her name at Norwich Savings Bank, Oppenheimer and Fleet Bank. The defendant shall provide the plaintiff with all documents in his possession related to said funds.
17. The defendant shall retain sole ownership of the Amex Annuity, his Fleet Bank IRA, the Sherbourne bonds and the Franklin Fund IRA.
18. The defendant shall retain sole ownership of the cash value of his life insurance policies.
19. The defendant shall pay the plaintiff $75,000 as a property distribution. Payments of $25,000 shall be made by July 1, 1997, July 1, 1998 and July 1, 1999. The defendant shall provide the plaintiff with a note and mortgage on the property consisting of 5.1 acres of vacant industrial land at Fitchville Road in Bozrah and Lebanon, Connecticut in the amount of $75,000 securing this obligation.
20. The plaintiff shall be awarded sole ownership of the 1994 Volvo automobile and the defendant shall transfer all his right, title and interest is said automobile to the plaintiff.
21. The defendant shall retain sole ownership of his two boats and the 1995 Volvo automobile.
21. Each of the parties shall be solely responsible for payment of the liabilities listed on their respective financial affidavits.
22. Each of the parties shall be responsible for payment of their respective attorney's fees.
23. Each of the parties shall be equally responsible for one-half of the total fees of the attorney for the minor child and the total fees of the guardian ad litem. The outstanding balance of said fees shall be paid by the parties within sixty days.
24. Each party shall retain the personal property currently in his or her possession, except that the plaintiff shall convey to the defendant the following personal property within two weeks of the date of the dissolution: wicker floor lamp, sterling silver flatware, copies of family photos, two gray file cabinets, fax machine, unregistered 1961 car, maternal grandmother's bed CT Page 2504 and headboard set, "KR 241" license plate, defendant's personal clothing, tools and parts in cellar and four lobster pots.
25. The plaintiff shall pay to the defendant attorneys fees in the amount of $750 and fines totaling $1,050 for her contempt of the court's visitation orders. Said sums shall be paid to the defendant within two weeks of the dissolution.
Jon M. Alander, Judge